Filed 6/24/14  Adoption of D.L. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Adoption of D.L., A Minor. | |
| V.G.,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>Y.T.,<br><br>　　　Defendant and Appellant;<br><br>E.L.,<br><br>　　　Respondent. | B250258<br>(Los Angeles County<br>Super. Ct. No.  LT000975) |

APPEAL from an order of the Superior Court of Los Angeles County.  John L. Henning, Judge.  Affirmed as modified.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas R. Donnelly; Diane M. Goodman for Plaintiffs and Respondents.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Minor.

Appellant Y.T. appeals the court's finding under Family Code section 8604 that she willfully failed to communicate with or contribute to the support of her son D.L. for one-year, leaving the door open for D.L. to be adopted by his stepmother, respondent V.G., and terminating appellant's parental rights.[1]  Appellant contends section 8604 is unconstitutional because it permits loss of parental rights without a finding of unfitness, and that the court should have proceeded under an alternate statutory procedure requiring a finding of "abandonment" to support termination of parental rights.  Appellant forfeited these contentions by failing to raise them in the trial court.  Moreover, we would reject her claim on the merits.  The findings under section 8604 do establish parental unfitness and, in any event, a specific finding of unfitness is not required where, as here, a mother has left her child to be raised and supported by others for a lengthy period without reasonable excuse or justification.  We conclude, however, that the trial court's inclusion in its order of language terminating appellant's parental rights over D.L. was premature.  A true finding under section 8604 permits D.L.'s adoption to go forward absent appellant's consent but does not, in itself, operate to terminate parental rights.  Accordingly, we modify the court's order and affirm as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

D.L.'s father E.L. (Father) and appellant married in March 2006.  D.L. was born in May 2006.  The couple separated in December 2006, when D.L. was seven months old.

---

[1]     Undesignated statutory references are to the Family Code.

A. *Prior Proceedings*

After the separation, appellant had primary custody of D.L. In March 2007, Father asserted that appellant had prevented him from seeing his son since January of that year. The court issued an order granting Father evening and alternate weekend visitation. In October 2007, the parties entered into a settlement agreement, approved by court order, under which Father was to have visitation every Tuesday evening through Thursday morning and alternate weekends from Friday evening until Monday morning.[2] The custody exchanges were to take place at a sheriff's station.

After the settlement agreement was signed and approved, appellant moved with D.L. but did not notify Father of her new address or telephone number. In late 2007 and early 2008, Father appeared at the sheriff's station for the custody exchanges, but appellant did not.[3] In February 2008, having no knowledge of appellant's or D.L.'s whereabouts, Father filed a missing person's report.

In April 2008, the court granted Father's application for full custody of D.L. and ordered the district attorney to locate and return the boy. Appellant and D.L. were located. Appellant was arrested and subsequently pled guilty to child concealment (Pen. Code, § 278.5, subd. (a)).[4] The court placed D.L. in Father's

---

[2]    In the fall of 2007, when the parties were attempting to settle their marital and custody disputes, appellant went to court seeking to change D.L.'s last name. In that proceeding, she falsely represented that she did not know where Father was.

[3]    Father was sending child support payments to appellant's attorney, but the attorney advised Father that he did not know where to contact appellant.

[4]    After being located, appellant claimed she "did not know what to do" with respect to visitation because she did not have a copy of the settlement agreement, although she had signed it and was present in court when it was approved.

custody and for a period permitted appellant monitored visitation only.[5] In early 2009, the court ordered a psychiatric evaluation of appellant. In April 2009, at the recommendation of minor's counsel and the psychiatric evaluator, the court changed the visitation order, permitting appellant to have daytime unmonitored visits. Appellant did not take advantage of the unmonitored visitation approved by the court, refusing to cooperate in selecting a location where D.L. could be dropped off and picked up.[6] In July, appellant reported to the Department of Children and Family Services (DCFS) that D.L. was being abused, causing Father to be investigated by DCFS and the police. Minor's counsel reported that appellant's behavior had become "dangerously erratic," and that she had reverted to her "uncooperative, somewhat paranoid positions." Minor's counsel recommended that visitation revert to monitored, and that any future claims of abuse be reviewed by minor's counsel before being reported to authorities. In August 2009, the court adopted these recommendations. Thereafter, the court's orders continued to permit appellant monitored visitation only. The orders also stated that all communication between the parties was to be through Our Family Wizard.

In April 2010, minor's counsel learned that appellant had not seen D.L. for many months and set up a Skype visitation schedule for appellant and D.L. In August, the court changed the visitation order, permitting appellant to have three 10-minute Skype sessions with D.L. per week, in addition to the monitored

---

[5]     From August 2008 to April 2009, appellant visited D.L. at the monitoring facility. During these visits, she examined D.L. for marks and constantly complained that he was not being well cared for by Father, although the monitor warned her this behavior was detrimental to D.L. No one else with regular contact with the boy observed any signs of abuse or neglect.

[6]     Appellant and D.L. had a visit in June 2009, apparently monitored. There is no indication in the record of any other in person visitation after that date.

4

visitation.  In early fall of 2010, after two brief periods of Skype communication, appellant ceased all contact with D.L.

B.  *Underlying Proceedings*

In March 2011, Father married V.G.  In October of that year, when D.L. was five, V.G. filed a request seeking to adopt him.  The adoption request alleged that appellant had not contacted the child for over a year within the meaning of section 8604.[7]  Appellant filed an objection.  In addition, in November 2011, appellant sought mediation of the "dispute relating to [the] existing custody order."  She stated in a supporting declaration that she had not visited D.L. for over two years and had not had Skype contact with the boy for over a year.  She claimed this was because "Father [was] making it very difficult for [her] to visit and maintain contact . . . ."[8]

The court issued a citation re adoption, ordering appellant to appear and show cause why the adoption petition should not be granted.  The court appointed counsel for appellant.  The court notified DCFS that it had issued the citation/notice of hearing in connection with the petition for adoption filed under section 8604, seeking a report and recommendation from the agency.  DCFS

---

[7]  Section 8604, subdivision (a) states that "[e]xcept as provided in subdivision (b), a child having a presumed father under Section 7611 may not be adopted without the consent of the child's birth parents, if living."  Subdivision (b) provides:  "If one birth parent has been awarded custody by judicial order, or has custody by agreement of both parents, and the other birth parent for a period of one year willfully fails to communicate with and to pay for the care, support, and education of the child when able to do so, then the birth parent having sole custody may consent to the adoption . . . ."

[8]  After receiving the petition, appellant was permitted to communicate with D.L. through Skype again for a brief period.  During their conversations, she told D.L. that V.G. was just a "temporary babysitter," and advised him to not call V.G. "'Mommy'" or Father "'Daddy,'" and to tell his teachers he needed to see a psychologist.  She also called D.L.'s school, claimed he was being abused, and urged the principal to report it.

personnel interviewed the family and in September 2012, filed a report recommending V.G. be permitted to adopt D.L.

In December 2012, the court appointed a psychiatric expert, Nancy Kaser-Boyd, Ph.D., to interview the parties, evaluate bonding issues, and determine whom D.L. considered to be his parents and where his best interests lay. The court also instructed Dr. Kaser-Boyd to include an evaluation of appellant's ability to cooperate, and her ability to care for and control the minor. In her interview with Dr. Kaser-Boyd, appellant claimed to have been abused, manipulated, and threatened by Father throughout their marriage, and to have hidden her address from him after they separated because she was afraid of him. Dr. Kaser-Boyd found nothing to support appellant's assertions of abuse. She found appellant to be defensive and not amenable to treatment or change. Dr. Kaser-Boyd was unable to give appellant a "'clean bill of mental health' . . . for parenting" in view of her defensiveness and her history of failing to follow the rules of shared custody or make appropriate child-centered decisions.

During his interview, Father stated that appellant's visits with D.L. had stopped in June 2009 because appellant did not want to pay her share of the monitoring expenses. He explained that the 2010 Skype visits lasted only two or three months. Because appellant had not regularly visited D.L. for some time, D.L. did not remember her or understand her relationship to him and considered V.G. to be his mother. V.G. said she accepted D.L. as her son and wanted their relationship to be made legal. During Dr. Kaser-Boyd's interview with D.L., the boy made clear that he believed V.G. was his mother and had no understanding of appellant's relationship to him. Dr. Kaser-Boyd observed the interactions between D.L. and V.G. They were affectionate toward each other and the two appeared to be bonded. The report stated that although D.L. had enjoyed his visits with appellant and was comfortable with her, he was not cognizant of her relationship to

6

him. He referred to her as "'a girl'" who "'brings [him] stuff . . . .'" Dr. Kaser-Boyd concluded that it would be in D.L.'s best interest for the adoption to go forward.

The court held hearings over the course of three weeks to determine whether appellant had willfully failed to contact D.L. and provide support for the child over a period of one year or more within the meaning of section 8604. It was undisputed that appellant had never paid support. In addition, appellant acknowledged that she had had no contact with D.L. for more than a year at the time the petition was filed. She and her mother, who was also called as a witness, claimed Father was abusive and interfered with her contact.[9]

Father denied abusing appellant. He testified appellant did not visit D.L. during the period unmonitored visits were permitted. After June 2009, she did not seek in person visitation of any kind. In 2010, the parties agreed appellant could have Skype communication with D.L. Appellant stopped the Skype contact in early 2010, complaining that D.L., who was only three at the time, was not speaking to her or sitting still in front of the camera. Appellant renewed Skype visits in September 2010 for approximately three weeks before stopping again. Father denied interfering with any of these contacts. In October 2010, at around the same time as the last Skype interaction, appellant informed Father that she would no longer communicate through Our Family Wizard, leaving no court-sanctioned way to set up visitation or Skype contact. Father testified that D.L. began calling V.G. "Mama" on his own, without any prompting from Father or

---

[9]    Appellant also claimed that she could not afford to pay her share of the monitoring expenses. However, she had been employed continuously since the dissolution. Moreover, the record reflected that she had spent thousands of dollars in attorney fees contesting visitation and other issues in the marital dissolution and child custody litigation and had expended funds to hire a private investigator to follow Father.

V.G.  Father perceived no current relationship between appellant and D.L. and believed D.L. had begun to forget appellant due to the passage of time after regular visitation ceased.

The court found the evidence supported a prima facie case under section 8604:  that appellant had not, in fact, communicated with or supported D.L. for more than one year.  The issue was whether the failure had been willful and, in particular, whether appellant had been prevented from assuming her parental obligations.  This presented an issue of credibility.  The court found the testimony of appellant and her mother to be "highly unbelievable" and concluded that appellant was "not credible in almost any aspect of her testimony."  The court "question[ed] almost each and every word that [appellant] testified to in this matter."  The court found it "clear beyond any reasonable doubt" that the requirements of section 8604 had been met.  With respect to D.L.'s best interest, the court agreed with Dr. Kaser-Boyd that the boy was "'very bonded'" to Father and V.G and saw them as his parents, but had no parent/child relationship with appellant.  It followed that "it would not be in the best interest of this child to be with the natural mother, that it's in the best interest of the child to be with the natural father and his wife."

The court entered an order "find[ing] that the requirements under Section 8604 of the Family Code have been met" and  "terminat[ing] the parental rights of [appellant]."  This appeal followed.[10]

---

[10]    D.L.'s appointed counsel filed a separate brief urging affirmance of the trial court's findings under section 8604.

8

**DISCUSSION**

A. *Section 8604 Is Not Unconstitutional, and Deprivation of the Right to Object to an Adoption Need Not Be Supported by a Finding of "Abandonment"*

Appellant contends the court erred in proceeding under section 8604 because the provision did not afford her the due process protections to which she was entitled as a biological mother. She further contends that any termination of her parental rights or determination that her consent to adoption is not required must fail, absent a finding that she abandoned her child within the meaning of section 7822. Appellant failed to challenge the constitutionality of section 8604 or argue the applicability of section 7822 below.[11] She has, therefore, forfeited these contentions. (See *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1503 [facial challenge to constitutionality of statute may be forfeited if not presented to trial court]; see also *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 825-826 [appellate court declined to consider timeliness of service of contempt motion where appellant failed to raise issue in trial court]; *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 1002 [mother foreclosed from challenging computation of child support award on appeal where she did not raise issue in trial court].) Moreover, for the reasons discussed, we would reject her claims.

As noted, section 8604 provides that consent of a non-custodial birth parent to an adoption is not required where that parent "for a period of one year willfully fails to communicate with and to pay for the care, support and education of the child when able to do so." Section 7822, subdivision (a)(3) provides: "A

---

[11]     Not only did appellant fail to raise the applicability of section 7822 in the court below, but on the first day of trial, when V.G. sought to amend her petition to add allegations under section 7822, appellant's counsel objected, preventing any issues pertaining to section 7822 from being addressed.

proceeding under this part [governing freedom from parental custody and control] may be brought if . . . [¶] . . . [¶] [o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent with the intent on the part of the parent to abandon the child." It is clear that the provisions of section 8604 and section 7822 create two distinct procedures, supported by different evidence and leading to different results. Under section 8604, "the sole issue, other than the child's best interests, is whether the noncustodial parent had the ability to communicate with and provide for the child, but willfully failed to do so." (*In re Jay R.* (1983) 150 Cal.App.3d 251, 258 [citing former Civil Code section 224, now section 8604].) A successful action under section 8604 "cause[s] a parent to lose his or her right to withhold consent to [an] adoption," but does not terminate parental rights. (*In re Jay R., supra,* at p. 258; accord, *In re Marriage of Dunmore* (2000) 83 Cal.App.4th 1, 4 [successful proceeding under section 8604 "permits an adoption to proceed without the consent of a parent who has willfully failed to communicate and support a child for one year," but parental rights are not terminated and parental support obligations are not alleviated until adoption is consummated].)[12]

In contrast, a petition under section 7822 requires a showing that the parent either failed to support or failed to communicate for one year, with the intent to abandon the child. (*In re Jay R., supra,* 150 Cal.App.3d at p. 258 [citing former Civil Code section 232, now section 7822].) If the moving party prevails in a petition brought under section 7822, the child will be "'declared free from the

---

[12]     As will be discussed further below, the court erred in entering a judgment stating that appellant's parental rights over D.L. were terminated based solely on its true findings on the allegations asserted under section 8604.

10

custody and control of either or both of his parents'"; in other words, parental rights will be immediately terminated. (*In re Jay R., supra,* at p. 257; see § 7820.)

Appellant is correct that unlike section 7822, section 8604 requires no evidence of an intent to abandon. (*In re Marriage of Dunmore*, *supra*, 83 Cal.App.4th at p. 5.) "The action[] which may cause a parent to lose his or her right to withhold consent to [an] adoption may be 'tantamount to abandonment,' but 'abandonment' within the meaning of section [7822] is not an issue in a stepparent adoption . . . ." (*In re Jay R.*, *supra*, 150 Cal.App.3d at p. 258, italics deleted, quoting *Adoption of Thevenin* (1961) 189 Cal.App.2d 245, 250.)

Contrary to appellant's belief, however, our Supreme Court's decision in *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) does not support the contention that an absent biological mother's parental right to object to an adoption cannot be terminated without a finding of abandonment. *Kelsey S.* involved the rights of a biological father who had not established himself as a presumed father. The then-applicable statutes permitted a biological father's parental rights to be terminated if the trial court found by a preponderance of the evidence that it was in the best interests of the child to be adopted, without regard to the father's fitness or unfitness or any action the father had taken to assume responsibility for the child. (*Id.* at p. 823.) The pertinent statutory scheme permitted the biological father to become a presumed father only if he openly held out the child as his own *and* received the child into his home. (*Id.* at p. 825.) Noting that the father had been prevented from physically receiving the child into his home by the mother, the trial court, and the prospective adoptive parents, the court held that the statutory scheme governing presumed father status "violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on

11

nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities -- emotional, financial, and otherwise -- his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. . . . [W]hen the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Id*. at pp. 825, 849.)

In the context of its determination that biological fathers were not afforded equal treatment under the statutes governing adoption and termination of parental rights, the court examined the precursor to section 8604, former Civil Code section 221.20.[13] The child's prospective adoptive parents had obtained the mother's consent to the adoption, and contended that under the statute, only her consent was required. (*Kelsey S*., *supra*, 1 Cal.4th at p. 822.) The court explained that the provision provided a biological mother or presumed father "far greater rights" because it permitted the mother and presumed father to prevent an adoption "except in certain specified and narrow circumstances," such as where the mother or presumed father "willfully fail[ed] for a year or more to communicate with and support the child . . . ." (*Id*. at p. 824.) According to the court, this language required the consent of a mother or presumed father to an adoption "absent a showing by clear and convincing evidence of that parent's unfitness." (*Id*. at p. 825.) In so stating, the court equated proof of the elements of section 8604 -- a noncustodial parent's willful failure for a year or more to communicate and

---

[13] As the court explained, former Civil Code section 224 was repealed effective 1991 and its provisions set forth without material change in Civil Code section 221.20. (*Kelsey S., supra,* 1 Cal.4th at p. 825, fn. 5.) Civil Code section 221.20 was repealed effective 1994 and replaced by section 8604. (1992 Stats., ch. 162, § 10.)

12

support a child -- with proof of that parent's "unfitness." (1 Cal.4th at pp. 824-825.)[14]

Moreover, since deciding *Kelsey S.*, the Supreme Court has held that "a showing of current unfitness is not always necessary when a court terminates parental rights." (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1118 (*Ann S.*) italics deleted; accord, *In re Charlotte D.* (2009) 45 Cal.4th 1140, 1147-1150.) At issue in *Ann S.* was a provision of the Probate Code -- section 1516.5 -- which authorizes the termination of parental rights when children have been placed in a guardianship for at least two years, and the court finds that adoption by the guardian would be in the children's best interest. The court explained that *Kelsey S.* stands for the proposition that "the best interest of the child cannot justify terminating the rights of a parent *who has demonstrated a full commitment to parental responsibility, but whose efforts to secure custody have been thwarted*." (*Ann. S., supra,* 45 Cal.4th at p. 1130, italics added.) The court rejected a facial challenge to section 1516.5, finding that termination of parental rights could occur under its provisions only where the parent had "surrendered custody to the guardian and exercised no parental care or control for at least two years," which in the majority of cases would be antithetical to a finding of a "'full commitment to . . . parental responsibilities -- emotional, financial, and otherwise.'" (*Ann S., supra,* at pp. 1131-1132, quoting *Kelsey S., supra*, 1 Cal.4th at p. 849.) As the court explained: "[T]he procedural standards governing proceedings to terminate parental rights are not invariable. The nature and stage of the proceeding, and the

---

[14]    The court also equated a finding under section 8604 with a finding of unfitness in the summary of its holding:  "[T]he federal constitutional guarantees of equal protection and due process require that the father be allowed to withhold his consent to his child's adoption and therefore that his parental rights cannot be terminated *absent a showing of his unfitness within the meaning of Civil Code section 221.20* [now section 8604]." (*Kelsey S., supra*, 1 Cal.4th at p. 822, italics added.)

13

passage of time without parental custody, may make a difference. [¶] After years of guardianship, the child has a fully developed interest in a stable, continuing, and permanent placement with a fully committed caregiver." (*Id*. at pp. 1135-1136.)[15]

The procedures applicable under section 8604 fully comply with those the court deemed sufficient in *Ann S.* The issue under the statute is whether the parent has "willfully fail[ed] to communicate with and to pay for the care, support, and education of the child . . . ." (§ 8604, subd. (b).) The statute provides that "[f]ailure of a birth parent to pay for the care, support, and education of the child for the period of one year or failure of a birth parent to communicate with child for the period of one year" presents "prima facie evidence that the failure was willful and without lawful excuse." (*Id.,* at subd. (c).) Howecver, the parent is given an opportunity to present evidence concerning the circumstances surrounding the failure to support and communicate, his or her efforts to maintain contact, and any exigencies or special circumstances that prevented communication or support in order to refute that his or her actions were willful. (See *Adoption of Smith* (1969) 270 Cal.App.2d 605, 608-609 ["[B]efore a failure to communicate with her children for a period of one year may operate to deprive a mother of her right to

---

[15] In *Ann S.* the court also addressed the contention that the provision might be invalid as applied. The court acknowledged that there were "imaginable scenarios" of a parent who "find[ing] it necessary to place a child in guardianship and, despite maintaining a parental commitment as full as the circumstances permit[ted]," facing a termination proceeding. (*Ann S., supra,* 45 Cal.4th at p. 1132.) But because Probate section 1516.5 required the trial court to consider "'all factors relating to the best interest of the child,'" including "the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies[,] that might hamper those efforts, and other evidence of commitment to parental responsibilities," it was not likely to be applied invalidly. (*Ann S., supra,* at p. 1132.) The court explained in the companion case, *In re Charlotte D.*, that the statute was nonetheless "open to constitutional challenge as applied to an individual parent." (*In re Charlotte D., supra,* 45 Cal.4th at p. 1143.)

14

object to the adoption of her children, it must be shown that during the interval in question she was able to communicate with them and failed to do so."].)[16]

Appellant was provided the protections discussed in *Ann S*. In a lengthy proceeding covering a period of weeks, appellant was given an opportunity to refute the prima facie case by establishing that she had made an effort to fulfill her parental obligations but had been thwarted in her ability to do so. The court took a broad view of relevance, permitting appellant to testify concerning the couple's interactions during the marriage and the dissolution proceedings, as well as the more pertinent period between 2010 and 2011 when she maintained no contact with her child. Appellant claimed that Father had been abusive from the beginning and that she was afraid of him. She further claimed that she had tried to maintain contact with D.L. but that Father had interfered with her visitation and Skype communication. Father denied that he was abusive or that he interfered with visitation. The court, as trier of fact, was free to determine whose testimony to credit. Moreover, other evidence in the record refuted appellant's claim that she was thwarted by the actions of others from maintaining contact with her son. Her initial actions in concealing D.L. from Father caused her to be limited to monitored visitation. She used monitored visitation as an opportunity to find a basis for accusing Father of abuse. When the court permitted a period of unmonitored visitation, she failed to avail herself of the opportunity to re-establish a normal parental relationship with D.L. and engaged in behavior that caused visitation to revert to monitored. When she was offered Skype as a supplement to monitored visitation, she blamed Father for three-year old D.L.'s inability to sit still and

---

[16]    Appellant erroneously states that the findings under section 8604 are under the preponderance of the evidence standard. In a section 8604 hearing, the petitioner has the burden of proof by clear and convincing evidence. (*In re Jay R.*, *supra*, 150 Cal.App.3d at p. 265.)

15

unilaterally stopped that form of communication.  Although she claims Father interfered with her visitation, there was no evidence that in the year preceding October 2011, when the adoption petition was filed, she made any effort to communicate with or visit D.L.  On this record, the court's findings that appellant's lack of communication and support was willful and that the requirements of section 8604 had been met were amply supported.  The court's conclusion that D.L.'s adoption by V.G. could go forward without appellant's consent in no way violated her right to due process.

B. *The Court Erred in Issuing an Order Terminating Parental Rights*

As noted above, a successful action under section 8604 "cause[s] a parent to lose his or her right to withhold consent to [an] adoption," but does not terminate parental rights.  (*In re Jay R.*, *supra*, 150 Cal.App.3d at p. 258; accord, *In re Marriage of Dunmore*, *supra*, 83 Cal.App.4th at p. 4.)  After finding that the requirements of section 8604 had been met, permitting D.L. to be adopted by V.G. without appellant's consent, the court added language to its order terminating appellant's parental rights.  This was premature and in excess of the relief authorized by section 8604.  Accordingly, the language in the order terminating appellant's parental rights must be stricken.  Appellant's parental rights may be terminated only upon completion of the adoption of D.L.  (See § 8617.)

16

**DISPOSITION**

We modify the trial court's June 11, 2013 order by striking the language "and terminates the parental rights of [appellant]." As modified, the order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.